***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before Deputy Commissioner Hall as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, which has jurisdiction over the parties and over the subject matter of this claim.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The parties were subject to the Workers' Compensation Act at the time of the injury and an employment relationship existed between plaintiff and defendants at all relevant times.
4. It is stipulated and agreed that plaintiff sustained an injury to her back that arose out of and in the course of her employment that resulted in a specific traumatic incident to her back on February 7, 2001.
5. It is stipulated and agreed that defendants and/or carrier-defendant accepted plaintiff's February 7, 2001 incident as medical only and paid for medical treatment as documented by the stipulated printout of medicals paid.
6. Plaintiff missed less than seven days of work after the incident of February 7, 2001.
7. At the time of the injury, plaintiff earned an average weekly wage of $934.65, yielding a compensation rate of $623.10 subject to the 2001 statutory maximum compensation rate of $620.00.
8. Plaintiff last worked for defendants on February 22, 2002.
9. The following issues are before the Commission: whether plaintiff's current condition is causally related to and a continuation of the February 7, 2001 compensable injury; whether plaintiff is entitled to temporary total disability benefits from February 22, 2002 and continuing until such time as she is provided with suitable employment; whether plaintiff is entitled to past and future medical treatment for the injuries sustained on February 7, 2001.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the date of the hearing before the Deputy Commissioner, plaintiff was 60 years old. Plaintiff began working for defendants in December 2000 as an "admissions nurse." She is a registered nurse and is currently employed by defendants. Her job duties include admitting patients, assisting them in changing positions (stretcher to bed, bed to commode, etc.), completing a head to toe assessment, completing paperwork, educating the patient, and all other aspects of patient care when a floor nurse was unavailable.
2. On February 7, 2001, plaintiff had completed the admissions process with a patient and started an IV for the patient. Plaintiff was in the process of covering the IV site on the patient's hand while the patient was lying in bed. Plaintiff bent over to do this and felt something pop in her back. When plaintiff tried to stand up, she could feel pain shooting down her buttocks and leg. Plaintiff was unable to stand up straight.
3. Plaintiff immediately went to the main desk and reported her injury to Joanne Dowd. An incident report was completed with Ms. Dowd and plaintiff was advised to seek medical treatment. The claim was accepted as medical only and the last medical bill was paid on November 6, 2001.
4. On February 8, 2001 plaintiff sought treatment from chiropractor Donald Austin at Family Chiropractic Center. Plaintiff treated with Dr. Austin from February 8, 2001 until February 26, 2001. At her initial visit, plaintiff informed Dr. Austin that she was injured at work and was suffering from low back pain radiating into her leg. Dr. Austin performed an x-ray of plaintiff's lumbar spine and concluded that she had lumbar segmental dysfunction.
5. Specifically, the x-ray showed anterior malposition of L4 and decreased disc spacing of the L4 disc. Plaintiff's course of treatment consisted of receiving specific spinal adjustment at L4-5 level. Plaintiff discontinued treatment with Dr. Austin due to the expense and lack of improvement in her symptoms, but also due to the recommendation of her primary treating physician, Dr. Emile Vandermeer, who recommended that plaintiff undergo physical therapy.
6. Plaintiff returned to work on February 9, 2001 and was instructed to go to Sanford Medical Group for treatment. Dr. Vandermeer treated plaintiff during the majority of her visits from February 9, 2001 until March 29, 2001. On February 9, 2001, plaintiff was diagnosed with acute low back pain, given prescriptions for Vioxx and Vicodin for pain, and placed on light duty.
7. At her next visit on February 12, 2001, plaintiff was diagnosed with acute lumbar strain with some radicular symptoms. Plaintiff was prescribed pain medications and light duty restrictions. Upon her return on February 16, 2001, plaintiff's diagnosis was essentially the same, low back strain and possible right leg sciatica. On February 23, 2001, plaintiff's diagnosis was unchanged. She was continued on her medications and given light duty restrictions of "no lifting over 15 pounds, no bending." She was also prescribed physical therapy three times per week for two weeks.
8. Plaintiff underwent physical therapy at Central Carolina Hospital from February 26, 2001 to March 7, 2001. When asked about her previous history, plaintiff stated that she had never had anything similar to this condition before and, prior to this onset, she was completely free of symptoms. Upon her discharge from therapy, it was noted that plaintiff had significantly improved and her potential for continued improvement was good to excellent. It was further noted that her maximum rehabilitation potential had not been reached.
9. Upon returning to Dr. Vandermeer on March 29, 2001, plaintiff reported that she was much improved and "tolerating" her regular work duties. Dr. Vandermeer felt that plaintiff's low back strain was much improved and released her to regular duty. On the workers' compensation form completed for that visit, Dr. Vandermeer noted that plaintiff's condition was improving and the estimated time to recovery was noted as nearly resolved. Plaintiff was released although she had not reached maximum medical improvement according to Dr. Vandermeer's comments on the workers' compensation form.
10. Dr. Vandermeer did not take any x-rays or perform an MRI of plaintiff's spine, despite the diagnosis of radiculopathy and sciatica.
11. Plaintiff still had back pain when Dr. Vandermeer released her. She continued to experience episodes of increased pain in her back. She treated her back pain with anti-inflammatory medications in the months between her release by Dr. Vandermeer and her episode of acute lumbar pain in February 2002. Specifically, plaintiff used Vioxx and Voltarin periodically during the months between her release in March 2001 and February 2002. Plaintiff obtained refills of these medications in June 2001 and November 2001. By November 2001, plaintiff's back pain intensified and she used 60 tablets of Voltarin and 30 tablets of Vioxx in approximately 90 days from November 2001 until February 21, 2002.
12. On February 21, 2002, plaintiff suffered a severe episode of lumbar back pain. As a result, she had a neighbor drive her to the emergency room on the night of February 21, 2002. She was seen in the Central Carolina Hospital emergency room late that evening. She was stabilized and was discharged with medications.
13. Plaintiff went back to Central Carolina Hospital several hours later because of continued pain with very little relief and was admitted this time by Dr. S. David Ciliberto. The initial pain assessment sheet completed at this time states "pain started last night." This was a reference to the beginning of the severe episode of pain for which she had been to the emergency room the night before. According to the emergency room records, plaintiff told Dr. Ciliberto or his nurse that she had severe back pain that radiated into her right leg. The pain was off and on for one year, worse tonight. According to Dr. Ciliberto's notes dated February 22, 2002 and February 28, 2002, plaintiff stated to him that one year ago she had an episode of pain in her back with right-sided sciatica.
14. Dr. Ciliberto performed x-rays and an MRI to plaintiff's lumbar spine. The x-rays showed grade one over four anterior subluxation of L4-5, degenerative disc disease at L4-5, L5-S1. The MRI showed multilevel degenerative facet disease, grade one over four anterior subluxation of L4 on L5 with moderate to marked spinal canal stenosis and neural foraminal narrowing. Also, severe facet disease was present at L4-5. Dr. Ciliberto's assessment of plaintiff's condition was "lumbar intervertebral disc herniation, manifested as lumbago with right-sided sciatica." Dr. Ciliberto's plan of care consisted of intensive lumbar back pain care, pain medications, pelvic traction, and inpatient physical therapy. Plaintiff remained in the hospital for several days, until she was discharged on February 28, 2002 with instructions to stay out of work and to return to Dr. Ciliberto's office for a follow-up appointment. Plaintiff's diagnosis at discharge was lumbar spinal stenosis secondary to intervertebral disc degeneration and spondylolisthesis with lumbago. Dr. Ciliberto recommended laminectomy and spinal canal decompression with considered fusion of the spine because of the spondylolisthesis.
15. Plaintiff continued to treat with Dr. Ciliberto after her discharge from Central Carolina Hospital. Dr. Ciliberto saw plaintiff in his office for a follow-up visit on March 14, 2002. It was at this visit that he and plaintiff had a discussion regarding the history of her back injury. Dr. Ciliberto gave the opinion at that time, and again later when deposed, that plaintiff's current condition as of March 14, 2002 represented the continuum of degenerative disc disease of the lumbar back which first manifested itself as pain in plaintiff's back in February 2001.
16. On March 28, 2002, Dr. Ciliberto noted that the neurologic deficit in plaintiff's right foot continued to worsen. He completed a form for plaintiff entitled "Certification of Health Care Provider (Family and Medical Leave Act of 1993)." On this form he wrote, "2/7/01 initial symptom onset; 2/21/02 onset of current condition."
17. Dr. Ciliberto again saw plaintiff for follow-up visits on April 24, May 15, and June 24, 2002. Plaintiff continued to be placed out of work. As of July 24, 2002, plaintiff's right leg numbness had continued to worsen and plaintiff had no right ankle reflexes. Dr. Ciliberto testified that this was due to the interruption of the sensory motor reflex pathway for the lower extremities. It was Dr. Ciliberto's opinion in this case that this interruption was a result of the disc protrusion and spinal stenosis disorder. It was decided at that time that the laminectomy would be scheduled. A second MRI of plaintiff's lumbar spine was taken on July 27, 2002, the results of which showed degenerative changes in the lumbar back with spinal stenosis, subluxation of L4 on L5, which was considered to have progressed since the previous study of February 2002. There was also disc bulging of the L5-S1 disc extending to the right side.
18. On August 8, 2002, Dr. Ciliberto performed a spinal fusion, laminectomy, and disc excision surgery. It is Dr. Ciliberto's opinion that these procedures were necessary for the treatment of the progression of plaintiff's lumbar disc degeneration and spinal stenosis, which became symptomatic in February 2001.
19. Dr. Ciliberto saw plaintiff in September and October for follow-up after the surgical procedures of August 8, 2002. Plaintiff continued to have foot drop and was given a short leg splint for support. Dr. Ciliberto believes that the foot drop will be a permanent condition and may require plaintiff to wear a brace on that foot. Plaintiff's prognosis is good for restoration of ordinary activities. However, Dr. Ciliberto foresees the need for permanent restrictions that will affect plaintiff's ability to return to work in her former position as a registered nurse. Dr. Ciliberto felt that plaintiff would not be able to return to the general duty work of a nurse because of the heavy lifting and transfer of patients that is required. He did say that there were things within the field of nursing such as assessments and supervision that plaintiff may be able to do.
20. Plaintiff has been unable to earn wages in any employment due to her condition and has not yet reached maximum medical improvement. Plaintiff remains out of work under Dr. Ciliberto's orders.
21. Plaintiff had preexisting degenerative disc disease in February 2001, but it was asymptomatic and there is no history of injury to the back or disorder of the back before February 2001. There is also no history of a subsequent injury to plaintiff's back occurring between February 7, 2001 and February 22, 2002.
22. The Full Commission finds the greater weight of the medical evidence shows that plaintiff's back injury and subsequent back problems are a continuum of the degenerative disc disease of the lumbar back, which first manifested itself on February 7, 2001 when plaintiff injured her back at work. Plaintiff's admittedly compensable injury by accident on February 7, 2001 aggravated her degenerative disc disease and spinal stenosis causing it to become symptomatic.
23. Plaintiff's activities of daily life were affected by the February 7, 2001 incident. Plaintiff testified that she was unable to participate in activities such as playing 18 holes of golf, walking her dog for several miles, and swimming laps after the February 7, 2001 incident. Plaintiff continued to work after the February 7, 2001 injury despite the pain in her back due to financial necessity. To accommodate the pain, plaintiff attempted to avoid any heavy lifting at work. By November 2001, plaintiff was doing a lot of lifting. After a full day at work, the pain in plaintiff's back resulted in her having to spend some time laying flat on her back.
24. The Full Commission finds plaintiff's testimony to be credible.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In February 2002, plaintiff sustained a change of condition less than 12 months after defendants' last payment of plaintiff's medical bills for plaintiff's compensable injury of February 7, 2001 and plaintiff has been totally disabled from earning wages in any employment since her February 22, 2002 change of condition continuing to the present. N.C. Gen. Stat. § 97-47.
2. As a result of her change of condition, plaintiff has been unable to work since February 22, 2002. Plaintiff is temporarily disabled and entitled to temporary total disability compensation at the rate of $620.00 per week for the period of February 22, 2002 through the present and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendants pay for all medical expenses incurred or to be incurred as a result of her compensable injury as may be required to provide relief, effect a cure, or lessen the period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff at the rate of $620.00 per week for the period from February 22, 2002 through the present and continuing until further order of the Commission. Amounts that have accrued shall be paid in a lump sum, subject to an attorney's fee set out below.
2. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury.
3. Dr. David Ciliberto is hereby designated as plaintiff's treating physician.
4. The issue of permanent partial impairment benefits is reserved for a future proceeding, as plaintiff has not reached maximum medical improvement.
5. A reasonable attorney's fee of 25% of the compensation due under Paragraph 1 of this Award is approved for plaintiff's attorney. Of the lump sum that has accrued, defendants shall pay 25 percent of that sum directly to plaintiff's attorney and, thereafter, every fourth check shall be paid directly to plaintiff's attorney.
6. Defendants shall pay the costs.
This ___ day of August 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/kjd